## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 21-00035-01-CR-W-BP |
| | ) | |
| | ) | |
| YACUB E. WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Yacub Williams's Motion to Suppress Evidence filed October 6, 2021. Doc. 17. The Government filed Suggestions in Opposition on October 27, 2021. Doc. 20. Defendant did not file a reply, and the time for doing so has passed. L.R. 7(c)(3). For the reasons set forth below, it is recommended that Defendant's Motion to Suppress be **DENIED**.

## I.  BACKGROUND

On February 23, 2021, the grand jury returned an indictment charging Defendant Williams with being a felon in possession of a firearm. Doc. 1. Defendant's motion seeks to suppress evidence seized from a vehicle he had been driving but abandoned when he fled law enforcement on foot. Doc. 17. He contends the officers lacked probable cause or valid consent to search the vehicle. *Id*. at 2-4.

On November 17, 2021, the undersigned held an evidentiary hearing on Defendant's motion to suppress. Mr. Williams was present and represented by Assistant Federal Public Defender Ronna Holloman-Hughes. The Government was represented by Assistant United States Attorney Mike Green. At the evidentiary hearing, three witnesses testified: (1) Task Force Officer

Chance Cooper, (2) Deputy United States Marshal Micheal Stokes, and (3) Cortney Jones. Additionally, nineteen (19) exhibits were admitted into evidence.  *See* Docs. 28-29.

## II. FINDINGS OF FACT

Based on the evidence adduced at the evidentiary hearing, the undersigned submits the following:

1.      Chance Cooper, an officer with nine years' experience in law enforcement, has worked for the Jackson County Sheriff's Office for the last five years.  Tr. at 4.[1]  He is currently assigned to the United States Marshals Midwest Violent Fugitive Task Force, which is responsible for locating and apprehending fugitives.  Tr. at 4.

2.      In December 2019, Officer Cooper offered to assist Deputy United States Marshal Micheal Stokes with a fugitive investigation of Defendant.  Tr. at 4-5.  Deputy Stokes has worked with the United States Marshals Service for nineteen years.  Tr. at 41.  Since 2015, he has served as the supervisor of the enforcement section, which is responsible for enforcing the federal court's orders, including serving arrest warrants.  Tr. at 41-42.

3.      Officer Cooper and Deputy Stokes learned there was a supervised release violation arrest warrant issued for Defendant in early December 2019.[2]  Tr. at 5-6, 42-43; Gov't Ex. 1.  The warrant identified Defendant's address as 8033 88th Street, Kansas City, Missouri (the

---

[1] "Tr." refers to the Transcript of Hearing on Motion to Suppress.  Doc. 30.

[2] Defendant was previously prosecuted in this Court for bank robbery and using and carrying a firearm during and in relation to a crime of violence.  *See United States v. Mohammad, et al.,* Case No. 08-00173-02-CR-W-DW.  He received a sentence of 37 months on Count One and 84 months on Count Two to be served consecutively to Count One.  Doc. 92.  The sentence in Count One was also ordered to run concurrently to the sentence to be imposed in the parallel case of *United States v. Williams,* Case No. 08-00197-01-CR-W-BP.  In the 08-197 matter, Defendant was prosecuted separately for being a felon in possession of a firearm and received a sentence of 57 months to run concurrently to Count One in the 08-173 case.  On December 6, 2019, Chief United States District Court Judge Beth Phillips entered an order for the issuance of an arrest warrant for alleged violations of the conditions of his supervised release in both cases.  *See* 08-00197 (Doc. 53); 08-00173 (Doc. 129); Gov't Ex. 1.  The attempted execution of the arrest warrant gave rise to the events challenged in the instant motion to suppress.  Tr. at 6-7; 43.

"residence"). Tr. at 7; Gov't Ex. 1. Officer Cooper believed Defendant's girlfriend, Cortney Jones, owned the residence. Tr. at 9, 78.

4.      Prior to December 27, 2019, Officer Cooper conducted covert surveillance of the residence on at least two occasions. Tr. at 7-8. The residence was located among other single-family dwellings on a street with infrequent traffic. Tr. at 9. During both instances of surveillance, Officer Cooper observed Defendant exit the residence, enter a white Ford Fusion, leave, and then return a short time later. Tr. at 7-8, 44.

5.      On December 27, 2019, Officer Cooper assembled an arrest team to apprehend Defendant. Tr. at 8. He ensured sufficient officers were in the area to cover all potential exits and/or to safely handle Defendant's arrest. Tr. at 8. He intended to arrest Defendant outside the residence to minimize or negate exposure to any children who he believed could be present in the residence. Tr. at 8-9.

6.      Law enforcement began their surveillance around 7:00 a.m. on December 27, 2019. Tr. at 9. Officer Cooper was positioned to the west, around a blind curve, where he was able to observe the front of the residence. Tr. at 9-10. Deputy Stokes was positioned slightly southwest and behind the residence. Tr. at 45.

7.      Officer Cooper observed an individual exit the residence, get in the Ford Fusion, and drive away. Tr. at 10. He was unable to positively identify the individual as the Defendant. Tr. at 10. However, based on prior surveillance, Officer Cooper advised the other law enforcement officers that he believed the Fusion would return shortly. Tr. at 10-11, 36.

8.      No more than thirty minutes later, the Fusion returned to the residence and backed into the driveway where it was previously parked. Tr. at 11, 46. Officers observed the vehicle, which was still running, remain parked for approximately two to three minutes. Tr. at 11. The

3

driver, who was identified as Defendant, exited the driver's side and walked to the passenger's side. Tr. at 11-12, 46-47.

9.      Officer Cooper signaled the other law enforcement officers, who were wearing plain clothes with vests marked "police" on the front and back, to move into the area where the Fusion was parked. Tr. at 13, 36-37, 48. Law enforcement vehicles activated their emergency lights as they attempted to engage Defendant to ensure he knew they were law enforcement. Tr. at 13, 37, 48. Upon arriving at the residence, the officers exited their vehicles and identified themselves as law enforcement by saying "Police. Stop." Tr. at 14.

10.     Upon the arrival of the officers, Defendant fled on foot. Tr. at 13-14, 34, 49, 79. Defendant first walked in the direction of Deputy Stokes. Tr. at 48-49. Deputy Stokes stepped out from his position behind the building and commanded Defendant to stop. Tr. at 48-49. Defendant, however, changed directions and headed to the northeast, running around one of the law enforcement vehicles. Tr. at 49.

11.     Officer Cooper, also on foot, chased Defendant through a small open area and over a stone retaining wall. Tr. at 14. Although he momentarily lost sight of Defendant, Officer Cooper knew the direction Defendant was travelling and continued his pursuit. Tr. at 15.

12.     After pursuing Defendant for approximately forty-five seconds, officers were eventually led to a gas station located at 87th and James A. Reed Road in Kansas City. Tr. at 15-16, 37. The officers were informed Defendant got in the passenger seat of a Dodge Charger which left the area at a high rate of speed. Tr. at 15-16, 37.

13.     Over the radio, Deputy Stokes asked if any officer had remained with the Fusion parked at the residence. Tr at 49-50. When no one indicated they had, he returned to the residence and the car. Tr. at 49-50.

14.     After Defendant fled on foot, Ms. Jones, who was originally in the Fusion's passenger's seat, moved to the driver's seat because she had difficulties with her passenger side door.  Tr. at 50, 79-81, 90.  As she moved between the seats, she observed a gun next to the driver's seat covered with a black towel.  Tr. at 82-83, 90.  Prior to this discovery, she was unaware there was a gun in the vehicle and was surprised to see it because her daughter was also in the vehicle.  Tr. at 82, 90.[3]  Ms. Jones confirmed Defendant did not ask her to take custody of the firearm or to prevent others from having it.  Tr. at 90.

15.     Deputy Stokes arrived back at the residence and observed that Ms. Jones had moved from the passenger's seat to the driver's seat of the Fusion.  Tr. at 50-51, 66.  He approached and motioned for her to roll the window down.  Tr. at 51, 91.  Ms. Jones opened the driver's side door and advised she could not roll the window down because Defendant had the keys.  Tr. at 51, 67, 81, 91.  During this initial encounter, Deputy Stokes became aware of the young child in the vehicle.  Tr. at 67.

16.     Deputy Stokes advised Ms. Jones he had a warrant for Defendant's arrest and asked her if she knew where he would go.  Tr. at 52.  At this time, he observed a crumbled-up towel positioned by Ms. Jones's right thigh, in between the console and the driver's seat.  Tr. at 51-52.  Deputy Stokes found it odd to see the towel "kind of suspended in the air."  Tr. at 52.  He could not actually see the item covered by the towel at this time.  Tr. at 68.  He asked Ms. Jones if she would exit the vehicle and if he could search the immediate area of the vehicle for weapons.  Tr. at 52, 66-69.  According to Deputy Stokes, Ms. Jones verbally agreed to both requests and exited the vehicle.  Tr. at 52, 67-69.

---

[3] Her daughter was six years old at the time and seated in the backseat of the car.  Tr. at 80.

17.     Ms. Jones testified that when she opened her door to speak with the deputy, he knelt beside her door and rummaged through the cubby inside her driver's side door. Tr. at 81-82. She was then asked to exit her vehicle, and she voluntarily did so. Tr. at 82. She denied that Deputy Stokes asked her if he could look inside the car.[4] Tr. at 82.

18.     As Ms. Jones exited the vehicle, Deputy Stokes observed the towel was draped over something long and round which he immediately suspected was the stock of a rifle. Tr. at 53, 68-69. After obtaining verbal consent, he reached inside the vehicle, flipped the towel up, and observed an AR-15 style rifle. Tr. at 53-54; Gov't Exs. 3-4. He did not immediately recover the rifle as he was the only law enforcement officer present at that time. Tr. at 53. Ms. Jones told Deputy Stokes she did not know the firearm was in the vehicle and informed him Defendant uses the vehicle while she works overnight shifts. Tr. at 53-55. According to Deputy Stokes, she seemed dumbfounded the weapon was there. Tr. at 53.

19.     Other law enforcement officers, including Officer Cooper, conducted an area canvass for the Dodge Charger for approximately five to ten minutes. Tr. at 16-17, 37. After the unsuccessful pursuit of Defendant, they returned to the residence. Tr. at 16-17. Upon his return, Officer Cooper immediately walked to the Fusion where he observed Ms. Jones talking with Deputy Stokes at the back of the vehicle. Tr. at 17, 35.

20.     Deputy Stokes informed Officer Cooper he had observed a rifle in the vehicle. Tr. at 55. Officer Cooper asked Ms. Jones if there was anything else in the vehicle and he observed her child in the car. Tr. at 21. At this time, he asked Ms. Jones if they had her permission to search the vehicle, to which she verbally consented. Tr. at 21. When he opened the door to begin his

---

[4] Ms. Jones claimed she never verbally consented to the search of her vehicle at any time, including during the initial encounter with Deputy Stokes. Tr. at 86. She testified the officers never asked if they could search the vehicle. Tr. at 86. She also testified the officers never asked her about the gun or asked her if she knew the gun was in the car. Tr. at 87.

search, Officer Cooper observed the gun inside the Fusion between the center console and the driver's seat. Tr. at 17, 19, 21, 34; Govt. Exs. 2-4. The firearm's buttstock was covered with a black towel, and it was sticking up between the console and the seat. Tr. at 19, 39; Govt. Exs. 2-4.

21.     Ms. Jones testified that law enforcement informed her when she first exited the car that if she did not cooperate with them, she could lose her child, her job and her car. Tr. at 88, 96-97. She indicated these statements occurred before the searches of her home and the vehicle. Tr. at 96-97. Deputy Stokes testified that he did not tell her she could lose her child during his interaction with her. Tr. at 72. Further, Officer Cooper testified that his discussion with her about the consequences of aiding and abetting a fugitive, including the possibility of losing her child, occurred several hours later when he returned to the residence to follow-up with her. Tr. at 31, 38, 40.

22.     In speaking with Ms. Jones, Deputy Stokes learned that she was the registered owner of the Fusion. Tr. at 32, 55. He also asked her for information about who was driving the Dodge Charger or where it might be going. Tr. at 17, 52, 55-56.

23.     Because there was a one to two minute gap where all officers were gone from the residence, Deputy Stokes was concerned that Defendant had returned to the residence. Tr. at 56. Deputy Stokes asked Ms. Jones if she would allow the officers to check her home to see if Defendant was inside, to which she agreed. Tr. at 56-57, 70, 86. Deputy Stokes instructed officers to check the residence to make sure Defendant was not there. Tr. at 57.

24.     According to Ms. Jones, she asked to wait inside her home because it was cold outside, but officers told her she could not. Tr. at 35, 85-86. Instead, Ms. Jones and her daughter were permitted to go to a neighbor's residence while the residence was being checked. Tr. at 69-72, 85-86.

7

25.     After law enforcement confirmed Defendant was not present, Ms. Jones was allowed in her residence. Tr. at 70-71. Deputy Stokes instructed the other officers to talk with Ms. Jones about giving written consent to further search the residence and the vehicle. Tr. at 21, 55-56. Officer Cooper, accompanied by Deputy Marshals Nathan Ruebhausen and Glen McAvoy, went into the residence and discussed whether she would be willing to execute a written consent for the officers to further search her car and residence. Tr. at 21-22, 57, 72.

26.     When speaking with Ms. Jones inside the residence, Deputy McAvoy stood approximately six feet away from Officer Cooper. Tr. at 23. According to Officer Cooper, Deputy McAvoy explained the procedure for both consent forms, including the consent form authorizing the search of the vehicle. Tr. at 23, 101-02. No law enforcement officer threatened to arrest Ms. Jones, including prior to her execution of the consent forms. Tr. at 25.

27.     According to both Deputy Stokes and Officer Cooper, Ms. Jones did not appear to be under the influence of drugs or alcohol and seemed to understand everything the officers said to her, including the discussion of her consent to search the house and the vehicle. Tr. at 23-24, 103. During law enforcement's interactions with Ms. Jones, she was not placed in handcuffs at any point and no weapons were ever drawn and pointed in her direction. Tr. at 24-25, 64, 90-91.

28.     Ms. Jones signed the consent form allowing law enforcement to search her vehicle. Tr. at 25-26, 93, 95, 102; Gov't Ex. 13. She also signed a form consenting to the search of her home. Tr. at 26-27, 102; Gov't Ex. 14. The conversation regarding her consent to search took no more than five minutes. Tr. at 32, 65. According to Officer Cooper and Deputy Stokes, it would not have been the practice on December 27, 2019 to have Ms. Jones sign a blank consent form. Tr. at 72, 102.

29.     Ms. Jones testified at the suppression hearing the form she signed "wasn't a consent to search." Tr. at 87. She first claimed the forms were not explained to her. Tr. at 87-88. But

8

then she testified that the agents explained the forms were "acknowledgements" of the search. Tr. at 87-88, 94-96. She also claimed the forms had "a bunch of blank lines" on it when she signed it. Tr. at 87-88. When shown Exhibit 13, which was the consent form to search her vehicle, Ms. Jones initially testified that she signed the document. Tr. at 93. Ms. Jones then testified that the form she signed did not look like Exhibit 13 and that the exhibit "is a totally different piece of paper" than what was presented to her at the scene. Tr. at 94-95. Officer Cooper, however, testified that Exhibit 13 was the original consent form that was signed by Ms. Jones in his presence. Tr. at 25-26.

30. According to Ms. Jones, the threat of losing her child, job, and car made previously by Officer Cooper caused her to sign the consent forms. Tr. at 89. Officer Cooper testified that no such statements occurred prior to her executing the search consent forms.[5] Tr. at 38.

31. After obtaining her written consent, officers searched Ms. Jones's vehicle. Tr. at 27, 30, 57. They located and removed a Kel-Tec SU-16 firearm from the vehicle. Tr. at 27-28, 57. There were nine rounds in the magazine and one round in the barrel of the firearm. Tr. at 27-28, 57. The officers also recovered, *inter alia*, speeding tickets issued in Defendant's name and a rental car agreement signed by Ms. Jones related to a different vehicle. Tr. at 58-62; Gov't Exs. 6-10. They also seized a small clear baggie with suspected cocaine or methamphetamine, a small clear plastic cylinder with suspected marijuana, and a digital scale. Tr. at 29. 0

32. After completing the searches, Officer Cooper and Deputy Stokes spoke with Ms. Jones again. Tr. at 30-31, 63. Officer Cooper asked her where Defendant may have gone, and she again indicated she was willing to assist law enforcement in their investigation. Tr. at 30. During this conversation, Ms. Jones was informed that it was a crime to harbor a fugitive. Tr. at 63. This

---

[5] As noted *supra*, his discussion with Ms. Jones about the potential consequences of being prosecuted for aiding and abetting a fugitive occurred later that afternoon during a follow-up meeting. Tr. at 31, 38, 40.

warning is a standard practice of the Marshals Service in conducting fugitive investigations.  Tr. at 31.  At no time during this conversation was Ms. Jones threatened with arrest.  Tr. at 63.  After completing the search, the officers left Ms. Jones's home.  Tr. at 30-32, 38.

33.    Deputy Stokes testified that Ms. Jones was amicable and cooperative with him and that he felt she was being truthful.  Tr. at 65.  Officer Cooper also indicated that Ms. Jones expressed a willingness to assist them in locating the Defendant and to cooperate with their investigation.  Tr. at 22, 30, 32.

34.    Later the same afternoon, Officer Cooper returned to the residence to see if Ms. Jones had any more information regarding Defendant's whereabouts.  Tr. at 33, 40, 104. According to Officer Cooper, Ms. Jones acted completely different by not wanting to talk nor assist in their investigation.  Tr. at 33.  At that time, he reminded her again that if she aided and abetted Defendant, it is a federal crime.  Tr. at 33. 40.  He also advised at that time that if she was prosecuted, she could possibly have her child taken away and lose her job, her car and her home. Tr. at 40, 104.

35.    During the afternoon encounter, Officer Cooper asked Ms. Jones for Defendant's cell phone and wallet, which she showed him through the window.  Tr. at 98, 104.  He then left her residence.  Tr. at 33.  There were no searches or seizures conducted during the afternoon encounter between law enforcement and Ms. Jones.  Tr. at 33.  Officer Cooper later texted Ms. Jones and offered to pay her money for assistance in locating Defendant.  Tr. at 99, 105.

### III.    DISCUSSION

Defendant seeks to suppress the firearm seized from the search of the vehicle he was driving on December 27, 2019, before he fled from law enforcement.  Doc. 17 at 1.  He argues the search violated his Fourth Amendment rights because law enforcement lacked probable cause or valid consent to search.  *Id*. at 2-4.  The Government argues three separate justifications for the

recovery the firearm. Doc. 20 at 4-10. First, the Government argues Defendant abandoned the firearm when he fled from police. *Id*. at 4-6. Second, the owner of the vehicle, Ms. Jones, voluntarily consented to a search of the vehicle. *Id*. at 6-8. And last, law enforcement had probable cause to search based on the plain view doctrine. *Id*. at 8-10. Defendant did not file a reply and has not responded to the Government's arguments concerning abandonment and probable cause/plain view.

### A.    Standard

The Fourth Amendment provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…" U.S. Const. amend. IV. To protect citizens from unwarranted government intrusion, the Fourth Amendment generally requires law enforcement to obtain a judicial search warrant based on probable cause before searching private property. *See*, *e.g.*, *Shade v. City of Farmington*, 309 F.3d 1054, 1059 (8th Cir. 2002). The United States Supreme Court has held "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

### B.    Abandonment of Property

To claim the protections of the Fourth Amendment, a defendant must demonstrate that he possessed a reasonable expectation of privacy in the place searched. *See United States v. Crumble*, 878 F.3d 656, 659 (8th Cir. 2018) (citation omitted). The Fourth Amendment is not implicated by a warrantless search of property that has been abandoned. *United States v. Nowak*, 825 F.3d 946, 948 (8th Cir. 2016). If property is abandoned, a person forfeits his or her expectation of privacy

and cannot later raise a Fourth Amendment challenge to a subsequent search. *Crumble,* 878 F.3d at 659.

Whether property has been abandoned is determined "based on the totality of the circumstances" and the "objective facts available to the investigating officers, not on the basis of the owner's subjective intent." *Id.*; *Nowak*, 825 F.3d at 948. The Court considers two factors when reviewing abandonment: whether the defendant (1) denied ownership of the item, and (2) physically relinquished the item. *United States v. James*, 353 F.3d 606, 616 (8th Cir. 2003) (citing *United States v. Landry*, 154 F.3d 897, 899 (8th Cir. 1998)). The Government bears the burden of showing a defendant abandoned the property. *Crumble*, 878 F.3d at 659.

Here, Defendant physically relinquished both the car and the firearm when he fled the scene on foot. *See Nowak*, 825 F.3d at 948 (finding Defendant abandoned a backpack left in his friend's car when he fled the car after a traffic stop). There was no evidence that Defendant asked Ms. Jones to preserve his privacy interest in the Fusion or to safely take custody of, or maintain, the weapon. *See id.* at 949. As such, Defendant relinquished any expectation of privacy he may have had in the vehicle and any items located within when he fled. Based on the totality of the circumstances, the undersigned recommends a finding that Defendant does not have standing to challenge the search of the Fusion or the subsequence seizure of the firearm based on abandonment. Accordingly, Defendant's Motion to Suppress should be denied.

### C.     Consent to Search

Assuming *arguendo* Defendant did not abandon the property, the search of the vehicle and residence were still valid pursuant to Ms. Jones's consent to search. Voluntary consent to a search is an exception to the warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). "A warrantless search is valid under the Fourth Amendment if it is 'conducted pursuant to the knowing and voluntary consent of the person subject to a search.'" *United States v. Gastelum*, 11

12

F.4th 898, 904 (8th Cir. 2021) (quoting *United States v. Sanders*, 424 F.3d 768, 773 (8th Cir. 2005)). Consent can be provided "either by the suspect or by some other person who has common authority over, or a sufficient relationship to, the premises to be searched." *United States v. Guzman*, 507 F.3d 681, 687 (8th Cir. 2007). Further, the owner of a vehicle may consent to its search even if another individual is driving it. *See id.* (citing *United States v. Booker*, 186 F.3d 1004, 1006 (8th Cir. 1999)). A vehicle's owner "retain[s] a right to admit others to it at anytime." *Booker,* 186 F.3d at 1006.

The Government must prove by a preponderance of the evidence that consent was the product of an essentially free and unconstrained choice. *See United States v. Magallon*, 984 F.3d 1263, 1280 (8th Cir. 2021) (internal quotations and citations omitted). Consent may not be the product of duress or coercion. *See Schneckloth*, 412 U.S. at 248. The Eighth Circuit utilizes "several factors" in determining whether consent was given voluntarily, taking into account the "totality of the circumstances." *United States v. Garcia-Garcia*, 957 F.3d 887, 896 (8th Cir. 2020). The factors include, but are not limited to, the following:

> (1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals. It is also important to consider the environment in which an individual's consent is obtained, including (1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a secluded location; and (6) whether the individual stood by silently or objected to the search.

*Gastelum*, 11 F.4th at 904 (quoting *United States v. Carr*, 895 F.3d 1083, 1089 (8th Cir. 2018)). An officer is not required to advise suspects of their right to refuse to consent to a search. *See Gastelum,* 11 F.4th at 905.

The issue before the Court is whether Ms. Jones's consent was voluntarily given. Relevant here, there are several instances of consent to address. The first consent was Ms. Jones's verbal consent for Deputy Stokes to search the immediate area of the driver's seat for weapons. Shortly thereafter, Officer Cooper, upon seeing Ms. Jones's child in the car, also obtained a verbal consent to search the vehicle. After officers performed their initial searches, Ms. Jones also signed written consent forms for the search of her vehicle and residence.

The evidence established Ms. Jones was 36 years old and was able to read and write the English language. Officer Cooper and Deputy Stokes both testified that Ms. Jones appeared to understand what was being said to her and did not appear to be under the influence of any drugs or intoxicants. Deputy Stokes testified that Ms. Jones appeared to be of at least of average intelligence. Officer Cooper testified that Ms. Jones expressed a desire to cooperate and to assist with the investigation during the morning encounter.

### (1) Ms. Jones's Verbal Consent

After Defendant fled on foot upon seeing law enforcement, Deputy Stokes returned to the vehicle Defendant had been driving. Ms. Jones, who was previously sitting in the passenger seat, had moved to the driver's seat. When he approached the vehicle, Deputy Stokes did not have his weapon out, and throughout his encounter with Ms. Jones, his weapon was never displayed. He asked Ms. Jones to roll the window down, but she, instead, opened the door and indicated Defendant had the keys to the car, preventing her from rolling the window down. It is undisputed that Deputy Stokes asked Ms. Jones to exit the vehicle, and she did so voluntarily. Although disputed by Ms. Jones, Deputy Stokes asked her if he could search the immediate area for any weapons, to which she responded, "Yes."

There is no evidence that Deputy Stokes raised his voice, threatened Ms. Jones, or presented his weapon at any time. Nor is there evidence indicating the interaction was prolonged

or coercive in nature. Furthermore, Ms. Jones was never in custody or placed under arrest. There was no evidence that officers had physical contact with Ms. Jones or physically intimidated her in any fashion. While Deputy Stokes searched the immediate area for weapons, Ms. Jones did not raise any objection. Deputy Stokes's search of the immediate driver's area revealed the Kel-Tec SU-16 firearm at issue. Upon this discovery, Deputy Stokes stopped his search and went to the back of the car to speak further with Ms. Jones.

Officer Cooper returned to the area after his pursuit of Defendant and observed Deputy Stokes and Ms. Jones speaking at the back of the Fusion. Deputy Stokes advised him that there was a rifle inside the vehicle, and after observing Ms. Jones's young child sitting in the back seat, Officer Cooper asked Ms. Jones for consent to search the vehicle. There is no evidence that he raised his voice or presented his weapon. Again, Ms. Jones was not under arrest or in custody. There was no evidence that Officer Cooper had any physical contact or physically intimidated Ms. Jones. There is no evidence that the interaction was prolonged or coercive in nature. According to Officer Cooper, Ms. Jones again verbally consented to the search.

During the suppression hearing, Ms. Jones claimed the officers never indicated they wanted to search the car and never asked for consent to search the car at any time, including during the initial encounter with Deputy Stokes. She testified that she first discovered the officers were searching the car was when she came out of the neighbor's house. She also indicated the officers never asked her about the gun or asked her if she knew the gun was in the car.

Ms. Jones's testimony conflicts with the testimony of both Deputy Stokes and Officer Cooper with respect to the initial search of the vehicle for weapons. Due to the conflicting testimony, this Court must make a credibility finding. *See United States v. Carothers*, 337 F.3d 1017, 1019 (8th Cir. 2003); *United States v. Hernandez*, 281 F.3d 746, 748 (8th Cir. 2002). Based on the demeanor of the witnesses and an analysis of the content and consistency of their testimony,

the undersigned finds the testimony of Deputy Stokes and Officer Cooper was credible in all material aspects regarding the initial encounter and the verbal consent provided by Ms. Jones to perform the initial search of the vehicle. The undersigned finds the testimony of Ms. Jones was not credible on the issue of her initial encounters with Deputy Stokes and Officer Cooper and her verbal consent to search the vehicle for weapons.

As the owner of the vehicle and the person in possession of the vehicle, Ms. Jones provided valid consent for the initial search. The initial search was reasonable under the Fourth Amendment and the totality of the circumstances. The undersigned recommends a finding that Ms. Jones's verbal consents to search the vehicle was voluntary.

### (2)    Ms. Jones's Subsequent Written Consent

After the car and the residence were secured, the officers obtained Ms. Jones's written consent to search the Fusion and her written consent to search her home. According to Officer Cooper, Deputy McAvoy explained the consent form, and the procedure for a consent to search. This explanation took approximately five minutes, and Officer Cooper stated Ms. Jones seemed willing to assist them. She then signed the consent forms for the officers to search her Fusion and her residence.

Defendant argues the Ms. Jones's consent was obtained only "after threatening her with criminal liability." Doc. 17 at 4. Law enforcement does not dispute that criminal liability for aiding and abetting a fugitive was discussed, but the timing of this discussion is a contested issue. According to Officer Cooper, they advised Ms. Jones of the potential repercussions of aiding and abetting a fugitive *after* she verbally consented and signed the written consent forms. The warning regarding aiding and abetting a fugitive is a standard practice of the United States Marshals in all fugitive investigations.

According to Ms. Jones, law enforcement also told her that she could lose her children, her home, and her car as a consequence of aiding a fugitive soon after she stepped out of the vehicle and before any search was conducted. Deputy Stokes denied making any such statements during his initial encounter with Ms. Jones. Officer Cooper testified that his discussion with Ms. Jones about the consequences of aiding and abetting, including the potential for her losing her child, occurred later that afternoon when he followed up with her after the initial encounter. Based on the demeanor of the witnesses and an analysis of the content and consistency of their testimony, the undersigned finds the testimony of the law enforcement officers with regard to when the warning was given about aiding and abetting a fugitive, and when the conversation occurred about the consequences of aiding and abetting, was credible, while the testimony of Ms. Jones was not credible.

Ms. Jones's testimony regarding the written consent forms was also inconsistent and not credible. Ms. Jones first stated the form she signed "wasn't a consent to search." She then claimed the form had "a bunch of blank lines" on it. When shown Government's Exhibit 13 (the original signed consent form to search her vehicle), Ms. Jones initially confirmed that she signed the document. Upon further questioning, Ms. Jones testified the form she signed did not look like Exhibit 13 and that the exhibit "is a totally different piece of paper" than what was presented to her at the scene. Despite her contradictory testimony, Ms. Jones's signature is reflected on the consent to search form, as seen in Exhibit 13. Further, law enforcement testified it was not their practice on December 27, 2019 to have had an individual sign a blank form. The testimony of Ms. Jones regarding the written consent forms is inconsistent and not credible.

There is no evidence or testimony that the environment in which Ms. Jones signed the consent to search forms was coercive or that law enforcement made any promises or misrepresentations to her. Furthermore, Ms. Jones was never placed under arrest, and law

enforcement's conversation with her in her residence was not prolonged. There is no evidence that she was physically intimidated or contacted to affect her consent. Both officers testified that Ms. Jones was fully cooperative and willing to assist during the entire morning encounter. Based on the totality of the circumstances, the undersigned recommends a finding that Ms. Jones, as the owner of the vehicle, voluntarily signed the written consent form to allow the further search of her vehicle.

### (3)    Third-Party Consent

Defendant contends the officers "intentionally bypassed his privacy rights associated with the vehicle" by relying upon the consent of a third party. Doc. 17 at 4. Defendant cites one case to bolster this contention. *Id*. In *United States v. Brokaw*, the Eighth Circuit found it reasonable for officers to believe a third party's statement that he owned a camper trailer located on his property, even though defendant was staying inside the camper at the time of the search. 985 F.2d 951, 953-54 (8th Cir. 1993). The Court found that someone who reasonably appears to have control of the premises in question may properly consent to a search. *Id*. In doing so, the Court reiterated that law enforcement cannot "rely on a third party's consent to 'intentionally bypass' a person who is present and has a privacy interest in the premises that is superior to that of the consenting third party and who objects to the search." *Id*. at 953 (citing *United States v. Impink*, 728 F.2d 1228, 1234 (9th Cir. 1984)). In *Brokaw*, the defendant was present at the time of the search, and there was no evidence that he objected to the search or that the officers "intentionally bypassed" him. *Id*. at 954.

In the instant matter, Defendant voluntarily fled from the vehicle, and therefore, was not present at the time the vehicle was searched. As such, he did not and could not object to the search. Furthermore, as in *Brokaw*, it was objectively reasonable for officers to believe Ms. Jones, who was the registered owner of the vehicle and remained in possession of the car after Defendant fled,

18

had full authority to consent to its search. There was no evidence indicating law enforcement "intentionally bypassed" his privacy interest by seeking consent from the vehicle's owner. As such, Defendant's argument is without merit.

Upon consideration of the totality of the circumstances surrounding Ms. Jones's verbal and written consent to allow law enforcement to search her vehicle, the undersigned recommends a finding that she voluntarily consented to the search of the vehicle, and as such, law enforcement's search and recovery of the firearm was reasonable under the Fourth Amendment.

### D. Automobile and Plain View Exceptions

The Government also argues the search of the vehicle was valid, even without consent, pursuant to the automobile and plain view exceptions to the warrant requirement. Doc. 20 at 8-9. As stated *supra*, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Arizona*, 556 U.S. at 338. The plain view exception to the warrant requirement allows a warrantless search if the Government shows (1) the item seized was in plain view, (2) the officer was lawfully located where he or she may view the object, and (3) the item's incriminating nature was "immediately apparent." *United States v. Clay*, 579 F.3d 919, 932 (8th Cir. 2009) (citing *Horton v. California*, 496 U.S. 128, 136-37 (1990)). An item's incriminating nature is considered "immediately apparent" if the officer has "probable cause to associate the property with criminal activity." *Id*. (quoting *United States v. Garner*, 907 F.2d 60, 62 (8th Cir. 1990)).

In this case, law enforcement went to the residence to serve a supervised release arrest warrant on Defendant. After Defendant fled the vehicle he had been driving, Deputy Stokes spoke with Ms. Jones who had moved from the passenger seat to the driver's side seat. Deputy Stokes testified that when he first approached Ms. Jones, he observed a bath towel by her right thigh

between the driver's seat and the center console. Deputy Stokes found it odd to see a towel in that location "kind of suspended in the air." At this time, he asked her if he could check the immediate area for weapons, to which she agreed. Once she left the car, he observed that the towel was draped over something "kind of long and round." At this time, he suspected the towel was covering up the stock of the rifle. Once Ms. Jones cleared the car and consented to a search for weapons, he flipped the towel up and observed an AR-15 style rifle.

The standard set forth by the Eighth Circuit under the plain view doctrine is that the item's incriminating nature must be "immediately apparent." *See Clay*, 579 F.3d at 919. That is not the case here. Deputy Stokes observed a long, round ended item sticking up next to Ms. Jones's thigh under a towel that he certainly suspected could be a firearm. But he also testified the gun could not be seen while it was covered by the towel. Its incriminating nature was not "immediately apparent" until he removed the towel and observed the weapon. The undersigned recommends a finding that the plain view doctrine does not apply to the facts of this case.

The automobile exception allows officers to search a vehicle without a warrant so long as they possess "probable cause to believe that an automobile contains contraband or evidence of criminal activity . . . ." *United States v. Keck*, 2 F.4th 1085, 1089 (8th Cir. 2021). Here, there was no evidence that law enforcement had probable cause to believe the Fusion contained contraband or evidence of criminal activity prior to their initial encounter with Ms. Jones after Defendant had fled on foot. Again, Deputy Stokes observed what he suspected could be a weapon hidden under a towel between the driver's seat and the center console. But he also testified he could not see the weapon while it was covered by the towel. Based on the facts of this case, his suspicion does not rise to the level of probable cause sufficient to search the vehicle under the automobile exception. The undersigned recommends a finding that the automobile exception does not apply to the facts as presented at the suppression hearing.

20

### IV.    CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant's Motion to Suppress (Doc. 17).

Counsel are reminded they have fourteen days in which to file any objections to this Report and Recommendation.  A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation except on the grounds of plain error or manifest injustice.

DATE: February 4, 2022                     _/s/ W. Brian Gaddy_____
                                            W. BRIAN GADDY
                                            UNITED STATES MAGISTRATE JUDGE